**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

---

|                          |   |                         |
|--------------------------|---|-------------------------|
| LIONELL G. MILLER        | : |                         |
|                          | : |                         |
|    Petitioner, | : | Civil No. 08-2277 (KSH) |
|                          | : |                         |
|    v.     | : |                         |
|                          | : |                         |
| MICHELLE R. RICCI, et al., | : | **MEMORANDUM OPINION** |
|                          | : |                         |
|    Respondents. | : |                   |
|                          | : |                         |

---

     This matter came before the Court upon the petitioner's filing of a 28 U.S.C. § 2254 application.  See docket entry no. 1.  The petitioner was notified of his Mason rights, and the respondents submitted their answer, to which the petitioner duly replied.  See docket entries nos. 6, 13, 15 and 17.  There is no dispute among the parties that the petitioner challenged his conviction in the Superior Court of New Jersey, Appellate Division ("state court") by means of direct appeal and during the process of seeking post-conviction relief and, with regard to both denials of his appeal, the petitioner duly sought certification from the Supreme Court of New Jersey, which, too, was denied.

## I.   STANDARD OF REVIEW

Section 2254(a) gives the court jurisdiction to entertain a habeas petition challenging a state conviction or sentence only where the inmate's custody violates federal law:

> [A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen County Probation Dept., 128 F.3d 152, 159 (3d Cir. 1997).  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."  Smith v. Phillips, 455 U.S. 209, 221 (1982).  "If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable.  It is unnecessary in such a situation to inquire whether the prisoner preserved his claim before the state courts." Engle v. Isaac, 456 U.S. 107, 120 n.19 (1982).  "[E]rrors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997).  Moreover, "it is well established that a state court's misapplication of its own

2

law does not generally raise a constitutional claim." <u>Smith v. Horn</u>, 120 F.3d 400, 414 (3d Cir. 1997) (citation omitted); <u>see also</u> <u>Smith v. Zimmerman</u>, 768 F.2d 69, 71, 73 (3d Cir. 1985).

A district court must give deference to determinations of state courts. <u>Duncan v. Morton</u>, 256 F.3d 189, 196 (3d Cir.), <u>cert. denied</u>, 534 U.S. 919 (2001); <u>Dickerson v. Vaughn</u>, 90 F.3d 87, 90 (3d Cir. 1996). Federal courts "must presume that the factual findings of both state trial and appellate courts are correct, a presumption that can only be overcome on the basis of clear and convincing evidence to the contrary." <u>Stevens v. Delaware Correctional Center</u>, 295 F.3d 361, 368 (3d Cir. 2002). Where a federal claim was "adjudicated on the merits" in state court proceedings, § 2254 does not permit habeas relief unless adjudication of the claim

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is "'contrary to' a Supreme Court holding if the state court 'contradicts the governing law set forth in [the Supreme Court's] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme]

3

Court and nevertheless arrives at a [different] result."
Rompilla v. Horn, 355 F.3d 233, 250 (3d Cir. 2004) (quoting
Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

Under the "'unreasonable application' clause, a federal
habeas court may grant the writ if the state court identifies the
correct governing legal principle from th[e Supreme] Court's
decisions but unreasonably applies that principle to the facts of
the prisoner's case." Williams, 529 U.S. at 413. Whether a
state court's application of federal law is "unreasonable" must
be judged objectively; an application may be incorrect, but still
not unreasonable. See id. at 409-10.

A court begins the analysis by determining the relevant
clearly established law. See Yarborough v. Alvarado, 541 U.S.
652, 660 (2004). Clearly established law "refers to the
holdings, as opposed to the dicta, of [the Supreme Court's]
decisions as of the time of the relevant state-court decision."
Williams, 529 U.S. at 412. A court must look for "the governing
legal principle or principles set forth by the Supreme Court at
the time the state court renders its decision." Lockyer v.
Andrade, 538 U.S. 63, 71, 72 (2003).

## II.  BACKGROUND

The petition states three grounds upon which the petitioner
seeks habeas relief. The Court will address each of these
challenges seriatim.

4

## A.   CHALLENGES BASED ON FAILURE TO CALL WITNESSES

The relevant challenges articulated in the petition read as follows: "Petitioner was denied . . . effective assistance of counsel [because] trial counsel [did not] produce [two persons] as witnesses at trial." Docket entry no. 1, at 4. The state court's decision expressly addressed these challenges. See State v. Miller, 2007 WL 4553059 (N.J. Super. App. Div. 2007) ("Miller").

The state court's analysis was preceded by a discussion of the underlying facts. That discussion is rather lengthy, featuring a cast of characters fit for a Tolstoy novel and reading like a script for the game "Clue." However, n order to ensure against the danger of omitting the details deemed important by the state court, this Court finds it prudent to replicate the state court's lengthy discussion of facts in its entirety.

> On October 29, 1994, sometime between the hours of 2:00 a.m. and 4:30 a.m., Jeffrey and Gregory Jackson were robbed on the corner of Ellison Street and Graham Avenue in Paterson. A yellowish four-door car pulled up to the corner and a man jumped out of the back seat, putting a shotgun to Jeffrey's neck. A second man came from the car wielding a handgun that he held to Gregory's side. Jeffrey described the man with the shotgun as dark skinned, with braided hair, wearing Army fatigues and a ski mask covering his face. The man with the handgun was light skinned, wearing dark clothes and a bandanna across his face. The man with the shotgun took a goose-down coat and approximately $300 from Jeffrey. After completing the robbery, the two men left in the same car.

5

Meanwhile, in a nearby part of town, Heriberto Huertas and Roberto Esquilin experienced car trouble, causing them to pull over on Park Avenue. As the two men waited, a beige Infinity driven by Enrique Garcia pulled behind Esquilin's car. Huertas and Esquilin proceeded to speak with Garcia and his passenger, Eduardo Valladares, the owner of the car and Huertas's friend.  At that time, a black male "with dreadlocks," wearing a goose down coat, approached the group and asked if anyone had drugs. The group ignored the man and he walked away.

Approximately twenty minutes elapsed when another car containing four people pulled up.  A man with dreadlocks, trying to pull a ski mask over his face, exited the rear passenger's side door and commanded the group to "put their hands up."  Almost immediately, the man with dreadlocks fired his handgun.  Huertas ran. When Huertas looked back he saw another man trailing him and Esquilin "falling to his face."  A second man wearing a bandanna over his face exited the car from the passenger seat with a shotgun.  Despite being shot in his left leg and right heel, Huertas continued to run as he heard the handgun and shotgun firing repeatedly.  After the shooting subsided, Huertas returned to the scene to find Esquilin lying on the ground.  Esquilin had been shot three times.  A bullet entered his left leg, shotgun pellets entered his lower back and buttocks and another bullet entered his shoulder and struck his heart, proving to be fatal. According to Garcia, the man with the shotgun exited the Dodge from the backseat and the man with the handgun exited from the front passenger seat.

At the scene of the crime, police recovered .9mm casings and a magazine clip.  Police found the assailants' beige Dodge abandoned at the Christopher Columbus Housing Project in Paterson. In the front passenger area of the Dodge police found three .9mm rounds.

The Dodge belonged to Louise Goss of Hillside, who lent the car to Yolanda Mikell, the aunt of co-defendant Lamont Towns.  Mikell stated that on the night of the incident, she and Towns picked up [the petitioner] before stopping to talk to Jerry Clyburn. After Towns spoke with Clyburn, Towns told Mikell that she should take Clyburn's truck and they would take her

6

car. Mikell agreed, and drove the truck to her sister's home. Mikell testified that Towns then drove the Dodge with Clyburn in the front and [the petitioner] in the back. Additionally, Mikell saw [the petitioner] with a .9mm handgun prior to the incident.

Jerry Clyburn testified that on the night of the incident he entered the Dodge and sat behind the driver, Towns, while [the petitioner] sat in the passenger seat. Clyburn maintained that they drove down Park Avenue to 19th Street and exchanged words with a group of males, at which point [the petitioner] started firing a handgun at the men. After the shooting, [the petitioner] and Towns got in the Dodge and, with Towns driving, pulled away. Clyburn testified that he remained in the Dodge during the shootings. He further testified that [the petitioner] wore a bandanna and had a short haircut, and that Towns wore a black goose-down coat.

Towns, called as [the petitioner's] witness, admitted to wearing dreadlocks that night but asserted that he fired a handgun and Clyburn, not [the petitioner], fired a shotgun. He claimed that Mikell was present and drove the Dodge after the shooting. Contrary to Mikell, Towns denied that Mikell took Clyburn's truck. Towns denied that [the petitioner] was present at the time of the shooting, claiming he had not seen [the petitioner] at all that day. Towns' trial testimony, however, differed from prior statements made at his own earlier, separate trial, where he said that he drove the group to the scene, where [the petitioner] fired the .9mm handgun and Clyburn fired the shotgun. At [the petitioner's] trial, Towns stated that he previously falsely implicated [the petitioner] because his mother told him that the police said they would let him go home if he implicated [the petitioner].

Towns also testified that after the shootings Mikell drove the four of them to the apartment of Otis Clyburn, Jerry Clyburn's brother. There, the assailants hid the weapons that they used in the shooting. Towns claimed that Otis put the shotgun in the closet while Jerry Clyburn held on to the handgun. Jerry Clyburn testified that Towns and [the petitioner] let him out on Carroll Street before arriving at Otis's apartment. Otis testified that Towns and [the

7

petitioner], not Towns and Jerry Clyburn, came to his apartment. Otis further testified that while in his apartment, Towns asked [the petitioner] "why he shoot the guy?" On October 31, 1994, police searched Otis Clyburn's vehicle and found a handgun and shotgun matching the bullets and casings found at the crime scene.

Sabrina Simmons, who lived with Jerry Clyburn's other brother, Eugene Clyburn, testified that [the petitioner] confessed to her, and that Jerry was not responsible for the shootings.

[The petitioner denied spending time with Jerry and Otis Clyburn and denied that he had been to Otis's apartment. He also denied knowing Yolanda Mikell and testified that he had never been in her car. It was [the petitioner's] contention that on October 29, 1994, he arrived drunk at his home at approximately 2:30 a.m., became sick and went to bed. [The petitioner's] family members corroborated his alibi.

On January 27, 1995, an indictment was filed against [the petitioner], Lamont Towns and Jerry Clyburn, charging them with the following: purposeful or knowing murder of Roberto Esquilin, . . . ; felony murder of Esquilin, . . . ; first-degree robbery of Esquilin, . . . ; second-degree unlawful possession of a weapon, a .12 gauge shotgun and .9mm handgun, with intent to use such weapons unlawfully against Esquilin, . . . ; first-degree robbery of Jeffrey Jackson, . . . ; second-degree unlawful possession of a weapon, .12 gauge shotgun and .9mm handgun, with intent to use such weapons unlawfully against Jeffrey Jackson,. . . . ; first-degree robbery of Gregory Jackson, . . . . ; second-degree possession of a weapon, .12 gauge shotgun and .9mm handgun, with intent to use such weapons unlawfully against Gregory Jackson, . . . . ; second and third-degree aggravated assault of Heriberto Huertas, . . . ; third-degree possession of a weapon, .12 gauge shotgun and .9mm handgun, with intent to use such weapons unlawfully against Huertas, . . . . ; possession of a handgun without a permit, . . . ; possession of a firearm without a purchaser identification card, . . . possession of a handgun with the serial number defaced, . . . . In addition, [the petitioner] alone was charged with second-degree witness tampering . . . .

Clyburn and Towns had separate trials. At his trial, Towns was found guilty of murder and other offenses.  The State dismissed the charges against Jerry Clyburn and he testified on behalf of the State in [the petitioner's] trial.  [The petitioner's] jury . . . returned a guilty verdict on the following charges: . . . causing the death of Roberto Esquilin during the commission of a robbery; . . . aggravated assault of Huertas;  . . . possession of a shotgun with a purpose to use it unlawfully against Esquilin;. . . aggravated assault of Huertas; . . . possession of a shotgun with a purpose to use it unlawfully against Huertas; and . . . unlawful possession of a shotgun without a permit.

[In the state courts, the petitioner] presents two issues [asserting, <u>inter</u> <u>alia</u>, that] the petitioner was denied his right to effective assistance of counsel [(a) because of the counsel's discussion of] he anonymous calls implicating the [the petitioner; and (b) because of the counsel's] failure to call eyewitnesses Valladares and Vega. . . .
Valladares stated [to the police] as follows:

> Me and my cousin Enrique are sitting in my car which is parked on Park Ave. facing Madison Ave. by E. 19th St. It is after 4:00 a.m.  I saw a black guy with braids and he asked the crowd out on the block if anyone had any base. When he didn't get any he left and a short time later he returned.  I saw him get out of the front passenger side of beige Dodge Aries and he said to the crowd "Run your Shit" which means give me your stuff.  The crowd started to run and he started shooting.  I heard two shots. I saw another black guy with a shotgun. I ducked down in the car and Enrique drove off down Park Ave.

[Valladares] described the man with braids as wearing a "black goose down jacket black hood."  He could not describe the other man.  . . .

[Valladares did not testify at the petitioner's trial. However, some of] Valladares's statement [were] admitted through Officer Huntington.  [Specifically, the petitioner's] counsel elicited the following testimony:

Q.    I'm going to ask you, Officer, to refer to your
      notes and specifically to page 3 and this had to
      do with Eduardo Valladares, if you would look.
A.    Correct.
Q.    And he was at the hospital at the time?
A.    Of?
Q.    In other words, when you asked him some question,
      did you ask him questions at the hospital?
A.    Yes.
Q.    All right. And did he in fact tell you at that
      time a physical description of the people at the
      homicide? Just answer yes or no.
A.    Possible suspects?
Q.    Yes.
A.    Yes.
Q.    All right. And this was how long after you had
      gone to the scene?
A.    Approximately forty-five minutes to an hour.
Q.    All right. And what description did Mr. Valladares
      give to you as to suspect number one?
A.    He gave me a description of a black male, had long
      dreadlock, long black goose down jacket on and a
      bandanna on his face.
Q.    A bandanna on his face?
A.    Yes.
Q.    What description did Mr. Valladares give you as to
      suspect number two?
A.    A heavy-set black male with no hair.

Valladares's statement to the officer . . . did not
encompass his more complete description of the event
contained in his statement given at police
headquarters, quoted in full above.

[Same as Valladares, Miguel Vega was not called as the
petitioner's witness.]  Miguel Vega's statement [to the
police] was, in pertinent part, as follows:

      Around 4:00 a.m. me and Carlos Reyes were sitting
      in his car parked on E. 19th St. near the corner.
      Then my friends Enrique Garcia and Eduardo
      Valladares pulled up in their car and I got in.
      We began talking and then Robert the person that
      got shot walked over to the car along with Brace
      who also got shot and we were talking.  I am
      sitting in the car and we are parked on Park Ave.,
      near E. 19th St. facing Madison Ave.  Then a small
      beige Dodge Aries pulled up from E. 19th St. to

the corner and a black male got out of the car,
from the back and asked the people that were
standing around if anyone had any crack.  To me he
didn't look like somebody that smokes crack.  He
got back into the car and drove off with the other
two black guys in the car.  About, 10 to 15
minutes later the same car pulls up with the same
three guys in it.  The same guy got out of the car
and I saw him with a gun in his hand and another
guy was getting out of the car.

Vega was able to describe the one man as a "a black
male, he had braids in his hair, mustache and was
wearing three quarter length coat, black and green
hooded sweatshirt, sweats green and rolled up to his
knees."  [No statement made by Vega was introduced to
the petitioner's jurors.]

Miller, 2007 WL 4553059, at *1-7.

The state court ruled that, as to the counsel's failure to
call Valladares and Vega as witnesses, the petitioner's
challenges met the first prong of the test articulated in
Strickland v. Washington, 466 U.S. 668 (1984) (i.e., holding that
the petitioner's counsel "made errors so serious that counsel was
not functioning as the 'counsel' guaranteed . . . by the Sixth
Amendment"), see Miller, 2007 WL 4553059, at *9-11, but the state
court concluded that the second prong of Strickland was not met.
See id. at *11.

Explaining its finding with regard to the first prong of
Strickland, the state court observed that "Vega or Valladares[']
. . . testimony . . . could have been provided [with regard] to:
the description of the [assailants], or at least one of them;
which man got out of which seat in the car; and which man was

holding which weapon.  It was these details that contradicted
Clyburn's version. . . . [W]e fail to discern any strategic
reason why defense counsel did not call these witnesses.
Unfortunately, defense counsel was deceased by the time [the
petitioner's challenges were heard in the state courts] and could
not explain his decision."  See id. at *10.

As to the second prong of Strickland, the state court
explained its decision as follows:

> [W]e address the second Strickland prong, the question
> of prejudice.  Is there a reasonable probability that
> the testimony of the two non-produced witnesses would
> have produced a different outcome?  We think not.
>
> One or both of the witnesses would have supported
> a finding that [the petitioner] was not the man who
> exited the car with the handgun and fired the shot that
> killed Roberto Esquilin.  Rather, [the petitioner] was
> the man with the shotgun.  However, the jury did reach
> this very conclusion as reflected in its verdict that
> [the petitioner] possessed the shotgun, not the
> handgun, and was not guilty of murder but guilty of
> felony murder.  This verdict indicated that the jury
> was not persuaded by Clyburn's testimony in critical
> respects.  If [the petitioner] did participate in the
> attempted robbery, albeit with the shotgun not the
> handgun, he would still be guilty of felony murder.
>
> The only way the testimony of the two witnesses
> could have led to a different outcome is if that
> testimony so contradicted the testimony of Clyburn and
> the other State's witnesses that the jury would
> entertain a reasonable doubt that [the petitioner] was
> a participant at all, i.e. that he was not present, as
> he testified. But we are unpersuaded that the
> Vega/Valladares testimony would have caused such a
> result.  In one significant respect the absent
> testimony supported the State's case and contradicted
> the testimony of Towns.  Since Towns' position was that
> he and Clyburn were the men with the guns who exited
> from the rear seat and front passenger seat, it was

necessary for Towns to name a third person as the
driver.  According to Towns, that third person was
Mikell.  However, both Vega and Valladares said that
three men were in the Dodge -- no woman was mentioned.
Thus, in that critical respect they undermined Towns'
testimony and supported the State's theory.  Of course,
as we have already noted, Towns' testimony itself was
solidly impeached by his prior statements.

Based on our analysis we conclude that it was not
probable that the testimony of Vega and Valladares
would have changed the outcome of this case.  Thus, the
second Strickland prong has not been established.

Id. at *11.

### 1.   **Respondents' position**

The respondents maintain that the petitioner's trial

counsel's performance was not ineffective in the sense that the

petitioner's allegations fail to meet *both the first and the

second prongs* of the Strickland test.  See docket entry no. 13,

at 2-4.  However, while asserting that the counsel's decision was

a strategic choice, and that neither Vega nor Valladares could

produce a testimony that would have been both material and

favorable to the petitioner, see id. at 3, the respondents,

unfortunately, fail to elaborate on their position as to why such

testimonies would not be material or favorable, or what the trial

counsel's strategy could have been.  See id. at 2-4.  Hence, the

respondents' position could be summarized in the statement that

the outcome of the state court's determination (rather than the

entirety of the state court's reasoning) renders the state

courts' decision not an unreasonable application of the Supreme Court's precedent.

### 2. **Petitioner's position**

The petitioner's position is set forth in his traverse at length; the gist of his assertion is that the state court's determination (as to the petitioner's failure to meet the second prong of the Strickland test) was an unreasonable application of the Supreme Court precedent.  Specifically, he maintains:

> The Appellate Divisions findings that the testimony of Vega or Valladares would not have so contradicted the State's witness Jerry Clyburn and the other State's witnesses to the point where the jury would entertain a reasonable doubt that [the petitioner] was a participant at all, i.e., that he was not present, . . . are not supported by the facts.
>
> In both of these witnesses sworn statements to the Paterson Police on October 29, 1994 they stated that in the early morning hours of October 29, 1994 a beige Dodge Aries car pulled up to the location of Park Avenue and East 19th street in Paterson, New Jersey with three black males in it and one of them got out and began asking for drugs.  They both described this individual as having his hair in braids.  Vega[']s statement has this individual exiting from the back seat of the car.  They stated upon not receiving any this individual got back into the car and left.  Both stated shortly afterwards the same beige Dodge Aries car pulled up and the same individual exited the car with a handgun along with another suspect, who according to Valladares, had a shotgun, and began shooting.  . . .
>
> Their statements contradict the testimony of Jerry Clyburn that he only went to the location of Park Avenue and East 19th street once with petitioner and Lamont Towns in the early morning hours of October 29, 1994 and it was at that time that petitioner exited the front passenger side door of a beige four door Dodge

14

Aries with a handgun and opened fire on a group of
[h]ispanic [m]en who were gathered at that location.

Their statements also contradicted the testimony
of Clyburn that it was petitioner who exited the front
passenger side door of the car while armed with a
handgun.  Both witnesses statements have this
perpetrator as having braids.  Valladares gave the
Paterson Police a second sworn statement on October 30,
1994 after he positively identified a picture of Lamont
Towns from a photographic array line-up as being the
black male with braids who initially came to the
location asking for drugs and who returned a short time
later and got out of the front passenger side door with
a handgun and opened fire.

Vega and Valladares both gave a description of the
second gunman to an investigating Paterson Police
Officer on October 29, 1994 as being a heavyset black
male with no hair.

On October 29, 1994 petitioner was, one hundred
and eighty five pounds, six foot four inches tall with
a short afro.

Both of these witnesses stated in their statements
that after the suspects did the shooting and got back
into their car and proceeded to drive away they
proceeded to chase the suspects car in the car that
they were in.  They stated that they stopped pursuing
the suspect vehicle at Godwin Avenue in Paterson after
the suspects stopped their car and got out and pointed
guns at them. This also contradicted the testimony of
Jerry Clyburn given at petitioner's trail due to the
fact that his testimony fails to include any mention of
the car that he testified he Eduardo Valladares was
called as a witness by the State at the trial of
co-defendant Lamont Towns.

Clyburn testified that immediately following the
shooting he was driven to 16th Avenue and Carroll
Street in Paterson where he exited the car.  Godwin
Avenue is in the opposite direction and several blocks
away from where Clyburn testified he exited the car.
Their statements also contradict the testimony of Otis
Clyburn, Jerry Clyburn's brother and in whose
possession the guns used to commit the shooting were
found, testimony that petitioner while in possession of

15

a nine millimeter handgun came to his apartment which
was located in Paterson in the early morning hours of
October 29, 1994 along with Lamont Towns who he
testified was in possession of a twelve gauge shotgun.
. . .

    Vega and Valladares statements also contradict the
testimony of Jerry Clyburn's sister-in-law Sabrina
Simmons who testified that petitioner confessed to
shooting a Spanish guy with a nine millimeter handgun.
. . .
    Contained in petitioner's [submission] is an
affidavit given by Miguel Vega on July 21, 2009,
stating. . . that the perpetrator with the shotgun
exited the back passenger side of the car and was
approximately five foot eleven inches tall with a
stocky build.  This description is consistent with
Jerry Clyburns appearance and it contradicts his
testimony that . . . he sat in the back seat of the car
[during the robbery and murder of Esquilin].

Docket entry no. 17, at 4-12.

### 3.  Analysis

#### a.  Relation between contentions

The bulk of the state court's analysis is dedicated to the
discussion of which assailant was sitting in which car seat, and
which car seat corresponded to which weapon, i.e., the shotgun or
the handgun.  The petitioner now introduces another inquiry, that
is, which car seat corresponded to which hairstyle.

Consequently, the shuffling of persons, chairs and weapons
performed by the state court is now being taken to the next
level, transforming the discussion already resembling the game of
"Clue" into that resembling the game of "musical chairs."

For the sake of the argument, this Court conducts a
comparative assessment of the statements that correlated (or

allowed an inference of correlation between) the weapons and hairstyles.

During the initial robbery of Jeffrey and Gregory Jackson, two men were described as perpetrators; according to the state court, they arrived in a yellowish four-door car. One was dark skinned, with braided hair and a ski mask; he was the one with a shotgun. Another one was light skinned and had a bandanna across his face; there is no information about his hairstyle (thus, he might have had any), but it is known that he had a handgun. The perpetrators got away with, inter alia, Jeffery's goose-down coat.

The next incident involved a black male wearing the -- presumably, the same -- goose-down coat; that man unsuccessfully tried to solicit drugs. According to the state court, that man wore dreadlocks, while according to Vega and Valladares -- as they are quoted by the petitioner, and as Valladares was quoted by the testifying police officer -- that man had braids. According to the state court, as well as to Vega and Valladares, this drug-seeker got out of a beige Dodge Aries and, having his solicitations ignored, went back to the same car (where, as Vega and Valladares asserted, two other black males had been waiting for him).

The third incident affirmatively introduced the beige Dodge noted by the state court and, according to Vega and Valladares --

as they were quoted by the petitioner -- the very same Dodge that was carrying the drug-seeker and his two black male companions. Hence, it appears that Vega and Valladares' position is that the drug-seeker with braided hair and his two black male companions were the very persons who, shortly thereafter, were involved in the robbery of Esquilin and Huertas, and in murder of Esquilin.[1]

The state court defined only two persons from that Dodge: (a) a male with braids/dreadlocks who got out of the Dodge while pulling a ski mask over his face and firing a handgun shortly thereafter; and (b) another male, who had a bandanna over his face, that man eventually began firing a shotgun.  Thus, the state court corresponded dreadlocks to the handgun, and some other hairstyle to the shotgun.  That, in turn, suggests that Towns, who had dreadlocks, was the killer of Esquilin (since Esquilin was shot by the handgun), while the assailant with the unspecified hairstyle and shotgun was guilty of felony-murder. The state court arrived to the same conclusion corresponding weapons to the car seats in the beige Dodge.

Clybern's testimony was, seemingly, that the petitioner had a short haircut (rather than dreadlocks/braids) but was using the handgun, not shotgun.  Thus, it appears that Clyburn's testimony

---

[1]  Since Towns admitted having dreadlocks but was described by Vega and Valladares as a male with braided hair, it appears that Vega and Valladares -- perhaps due to being Hispanic rather than African-American -- were oblivious of the distinction between dreadlocks and braids.

criss-crossed hairstyles and weapons.  The state court concluded
that such criss-crossing indeed took place (conducting its
analysis by correlating weapons to car seats) but found that the
criss-crossing was immaterial because the jurors were not
persuaded by that aspect of Clyburn's testimony.

The petitioner appears to have no problem with the state
court's deducement that Towns was the person with braids/
dreadlocks, and that Towns was firing the handgun that killed
Esquilin; what the petitioner asserts is that the black male with
the shotgun and unspecified hairstyle was Clyburn rather than the
petitioner himself.  In support of his position, the petitioner
relies on Vega and Vallardes' definition of the shooter of the
shotgun ("five foot eleven inches tall with a stocky build" and
"a heavy-set black male with no hair," docket entry no. 17, at 4-
12), claiming that these definitions suit Clyburn better than
they suit the petitioner who was "one hundred and eighty five
pounds, six foot four inches tall with a short afro."[2]  Id. at

---

[2]   The Court notes, in passing, that it is not convinced by
the petitioner's argument.  A short "afro" haircut could be
easily defined as "no hair" hairstyle by someone having no
insight into African-American cultural background.  See, e.g.,
<<http://trendyhairstylewomen.blogspot.com/2010/02/afro-haircuts-
for-men-will-smith-short.html>> (defining the extra-short haircut
of Will Smith as short "afro").  Granted that Vega and Vallardes,
both non-African-Americans, were unable to distinguish dreadlocks
from braids, even though these hairstyles have very little in
common (that is, short of being "long hair" hairstyles), it is
indeed not implausible to presume that these witnesses would also
define a short Will Smith's-like "afro" as "no hair" hairstyle.

12.  The petitioner maintains, since these definitions would suit Clyburn better than the petitioner, the jurors -- had they been provided with Vega and/or Valladares' testimonies -- would have to conclude that the petitioner was entirely uninvolved in the murder of Esquilin.  Yet, the petitioner does not offer any explanation as to why the jurors found Valladares' statement about the shotgun-shooter being "stocky built" and with "no hair" (i.e., the definition introduced to the jurors through the officer's testimony) nor sufficient to come to the conclusion which the petitioner advocates in this matter.

### b.   Conviction at issue

What the petitioner (and, seemingly, the respondents) fail(s) to observe is that the state court's decision was a dual finding, although articulated with less than exemplary precision. Specifically, the state court addressed the petitioner's challenges in the contexts of the petitioner: (a) shooting "a" weapon; and, separately, (b) being among the perpetrators robbing Huertas and Esquilin, and killing the latter.  See Miller, 2007 WL 4553059, at *11.  For the purposes of this Court's analysis, the distinction between these two state court's findings is highly relevant.

Here, the petition was filed on or after May 4, 2008 (that is, the date of the petitioner's execution of his § 2254

application).  The petitioner began serving his concurrent sentences on or prior to January 24, 1997.  See <<https://www6. state.nj.us/DOC_Inmate/details?x=1001163&n=0>> (indicating the date of the petitioner's entry of the Department of Corrections custody).  The petitioner's sentence imposed in connection with the assault charges was ten years, see id; see also Miller, 2007 WL 4553059, at *4; and his sentence based on unlawful possession of a weapon was five years.  Consequently, even if this Court were to factor out all parole aspects and all good-conduct credits that the petitioner accrued as to these sentences, the petitioner's five-year and ten-year sentences based on assault and illegal possession of firearm expired more than a year prior to the petitioner's filing of his instant petition.

Thus, for the purposes of his instant petition, the petitioner is "in custody," within the meaning of § 2254 in-custody requirement, only with regard to his unexpired life sentence based on his felony-murder conviction.  See 28 U.S.C. § 2254(a); see also Mays v. Dinwiddie, 580 F.3d 1136 (10th Cir. 2009) (examining concurrent sentences in light of Maleng v. Cook, 490 U.S. 488 (1989), and concluding that, for the purposes of § 2254, the prisoner is not "in custody" with regard to his/her shorter-termed concurrent sentences that have expired by the time the prisoner files his/her petition while being "in custody" under the lengthier and still-running sentence(s)).

21

Consequently, the only conviction with regard to which this Court has jurisdiction to entertain the petitioner's challenges is the petitioner's conviction for felony-murder, while his convictions based on assault and illegal possession of firearm fall outside the Court's jurisdiction, rendering the inquiry into whether the petitioner was in possession of -- or firing -- "a" weapon wholly irrelevant.  In other words, for the purposes of the Court's analysis, the inquiry relevant inquiry ensues from the state court's finding that the petitioner was among the assailants (since that participation rendered the petitioner liable on the felony-murder charges).

The state felony-murder statute, N.J. Stat. Ann. § 2C:11-3, reads, in pertinent part, as follows:

a. . . .[C]riminal homicide constitutes murder when:
. . .
    (3)  It is committed when the actor, acting either alone or with one or more other persons, is engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery . . . , and in the course of such crime or of immediate flight therefrom, any person causes the death of a person other than one of the participants; except . . . it is an affirmative defense that the defendant:

        (a)  Did not commit the homicidal act or . . . aid the commission thereof; and

        (b)  Was not armed with a deadly weapon . . . ; and

        (c)  Had no reasonable ground to believe that any other participant was armed with such a weapon . . . ; and

> > (d) Had no reasonable ground to believe that
> >     any other participant intended to engage
> >     in conduct likely to result in death or
> >     serious physical injury.

N.J. Stat. Ann. § 2C:11-3(a)(3).

In light of the statutory language, the petitioner's felony-murder conviction does not turn on whether the petitioner was firing (or in possession of) the shotgun or the handgun, or any other weapon, or was merely waiting for Towns and Clyburn in the beige Dodge: so long as the petitioner was among the perpetrators robbing Esquilin and Huertas, the petitioner would be liable on the felony-murder charges associated with the killing of Esquilin.  Consequently, this Court's inquiry turns only on the reasonableness of the state court's statement that "the only way the testimon[ies] of [Vega and Vallardes] could have led to a different outcome is if that testimony so contradicted the testimony of Clyburn and the other State's witnesses that the jury would entertain a reasonable doubt that [the petitioner] was a participant at all, i.e. that he was not present," Miller, 2007 WL 4553059, at *10, while the reasonableness of the state court's finding that, "[i]f [the petitioner] did participate in the attempted robbery, albeit with the shotgun not the handgun, he would still be guilty of felony murder," id., falls outside this Court's jurisdiction since this statement focuses on the convictions and sentences based on the petitioner's firing and/or

possession of "a" weapon, that is, the aspect that falls outside this Court's jurisdiction under "in custody" requirement.

Hence, it makes no difference whether Valladares and/or Vega could testify that Clyburn -- rather than the petitioner -- was firing the shotgun: such testimonies would say nothing about the identity of the third black male in the beige Dodge.

### c.   Insufficiency of the omitted testimonies

In light of the foregoing, this Court agrees with the state court's conclusion that neither the testimony of Vega nor that of Vallardes would place the petitioner outside the crime scene and, thus, would be so material and favorable to the petitioner to change the outcome of the trial.  This is so because Vega and Vallares' description of the shotgun shooter would not provide the jurors with a reason to conclude that the petitioner was absent from the scene of the crime, and the testimonies of multiple witnesses (the bulk of whom is not mentioned in the instant Opinion) provided an abundance of direct and circumstantial evidence showing that the petitioner was among the assailants.

While the petitioner asserts that Vega and Valladares' testimonies would have contradicted the testimonies of witnesses other than Clyburn, the petitioner's position is wholly unwarranted.  Being present *only at the scene* where one of the

perpetrators tried to solicit drugs and then the shooting of
Esquilin and Huertas occurred, neither Vega nor Valladares could
provide any first-hand testimony (or *any* relevant testimony) as
to where Towns or Clyburn (or the petitioner) went after killing
Esquilin, what was said -- or not said -- in the presence of Otis
Clyburn, what weapons were -- or were not -- left in Otis
Clyburn's possession, what the petitioner said -- or did not say
-- to Sabrina Simmons, what did Mikell do -- or did not do --
prior to the chain of robberies, etc.: neither Vega nor
Valladares witnessed or had any information about any of these
events.

### d.   Petitioner's counsel was not ineffective

Consequently, the state court's decision as to the
petitioner's failure to meet the second prong of <u>Strickland</u> was
not an unreasonable application of the Supreme Court precedent.
However, this Court finds the state court's conclusion that the
petitioner met the first prong of <u>Strickland</u> an unreasonable
application of the Supreme Court precedent.

As the state court correctly noted,

> Under the first prong, defendant must "show that
> counsel's performance was deficient. This requires
> showing that counsel made errors so serious that
> counsel was not functioning as the 'counsel' guaranteed
> ... by the Sixth Amendment." [<u>Strickland</u>, 466 U.S.] at
> 687. Counsel's representation must meet an objective
> standard of reasonableness considering all the
> circumstances. <u>Id.</u> at 688. "Scrutiny of counsel's
> performance must be highly deferential" and should not
> be subjected to the "distorting effects of hindsight."

25

> Id. at 689.  A court reviewing an ineffective
> assistance of counsel claim must consider the facts of
> the particular case and apply a "heavy measure of
> deference to counsel's judgments."  Id. at 691.

Miller, 2007 WL 4553059, at *4.

Moreover, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation," Strickland, 466 U.S. at 690-91, and "it is entirely proper . . . to engage in record-based speculation as to what counsel's strategy might have been" for the purposes of examining the "petitioner's attempt to disprove the existence of a possible sound strategy." Kates v. Moore, 2009 U.S. Dist. LEXIS 77000, at *89 (D.N.J. Aug. 27, 2009) (quoting Thomas v. Varner, 428 F.3d 491, 500 n.8 (3d Cir. 2005)).

Here, the state court noted that it "fail[ed] to discern any strategic reason why defense counsel did not call [Vega and Valladares as] witnesses." Miller, 2007 WL 4553059, at *10. However, the state court simultaneously observed that,

> [s]ince Towns' position was that he and Clyburn were
> the men with the guns who exited from the rear seat and
> front passenger seat, it was necessary for Towns to
> name a third person as the driver.  According to Towns,
> that third person was Mikell.  However, both Vega and
> Valladares said that three men were in the Dodge -- no
> woman was mentioned.  Thus, in that critical respect
> they undermined Towns' testimony and supported the
> State's theory.

26

Id.

What the state court seemingly failed to notice is that the very conflict between Towns' testimony and the testimonies of Vega and Valladares provided the need for a strategic choice by the petitioner's trial counsel.  In other words, Vega and Valladares' testimonies were yielding a detriment to the petitioner's defense case based on the testimony of Towns (the only non-relative of the petitioner who was aiming to give the petitioner a complete alibi).  The decision not to risk impeaching this complete alibi and, hence, to forego the minor benefit of further impeaching Clyburn through testimonies of Vega and Vallardes (i.e., through the testimonies providing the petitioner with no alibi whatsoever) was a reasonable strategy, especially if the defense counsel had a hope to introduce Valladares' observation with regard to the "stocky-built man with no hair" through the police officer (as the defense counsel indeed did).  In follows that the defense counsel could reasonably seek only informal contacts with Valladares without investing active efforts in subpoenaing him (and to entirely forego the identical testimony of Vega).

The record here suggests this very scenario and the defense counsel's decision to "change horses in the mid-stream" only upon Towns' devastating cross-examination that effectively evaporated Towns' credibility.  Specifically, the record indicates that the

27

counsel: (1) assigned his investigator to merely seek pre-trial contacts with Valladares; but (2) directed the investigator to undertake aggressive efforts to actually subpoena Valladares *during* the petitioner's trial and *after* Towns' testimony was impeached on the grounds of the dramatic inconsistencies between what Towns stated during the petitioner's trial and Towns' own trial.  See Miller, 2007 WL 4553059, at *8 (reflecting the investigator's testimony as to the different modes and ardor of his attempts to contact Valladares before the petitioner's trial and during that trial); see also Docket Entries Nos. 15-9 to 15-11 (reflecting that the testimony of investigator L. Knoepfler as to his attempts to subpoena Valladares came right after cross-examination of Towns).  Consequently, unlike the state court, which noted that it "fail[ed] to discern any strategic reason why defense counsel did not call [Vega and Valladares as] witnesses," Miller, 2007 WL 4553059, at *10, this Court has little trouble detecting a strategic reason for the petitioner's trial counsel's election to put all his eggs in one basket, i.e., Towns' testimony, and not seek Vega and/or Valladares' testimonies contradicting the alibi Towns' was giving to the petitioner.

The foregoing conclusion is further supported by the fact that the testimonies of Vega and Valladares would be additionally problematic in light of the petitioner's assertion that

> [b]oth of these witnesses [would] state[] . . . that
> after the [assailants] did the shooting and got back

28

into their car and proceeded to drive away, [Vega and
Valladares] proceeded to chase [them] in the car that
they were in.  They stated that they stopped pursuing
the suspect vehicle [only] after the suspects stopped
their car and got out and pointed guns at them.

Docket entry no. 17, at 8.

While the petitioner seems to read these statements as
helpful to his defense, it appears that these statements would
detract from credibility of both Vallardes and Vega since, in the
environment common to an average law-abiding juror, it is likely
to be anomalous for an unarmed witness to chase armed assailants
who had just gone on a shooting spree; indeed, a more normal
reaction would be trying to get to safety (and as far as possible
from the assailants), and to alert law enforcement officials.
Consequently, the proposed testimonies might have suggested that
Vallardes and Vega were not truthful altogether or, at the very
least, that -- on the night on Esquilin killing -- they were
cruising Peterson at 4 a.m. being armed with illegal firearms,
the possession of which allowed them not to fear the assailants.
Either alternative calls into question their credibility, adding
another negative to the fact of their testimonies, the key
negative of which was their ability to cast doubt on the alibi
Towns was giving to the petitioner.

For these reasons, the Court agrees with the respondents'
position that the outcome of the state court's decision was not
an unreasonable application of the Strickland test, although the

state court's finding that the petitioner met the first prong of
Strickland was unreasonable under Strickland.   Consequently,
issuance of a writ with regard to the petitioner's challenges
based on the fact that Vega and Valladares did not testify during
the petitioner's trial would be unwarranted, and the petitioner's
application to that effect will be denied.

**B.   CHALLENGES BASED ON COUNSEL'S QUESTIONS AND SUMMATION**

The Court reaches the same conclusion as to the petitioner's
second challenge asserting that his trial counsel was ineffective
by soliciting a testimony that the petitioner deemed harmful to
his cause.

The state court described the relevant facts and its
reasoning underlying the state court's conclusion as follows:

> [The petitioner] argues that [his] counsel's references
> to anonymous calls implicating defendant prejudiced his
> case and was devastating to his defense. . . .
>
> During cross-examination of Detective Sergeant Alex
> Nieves, defense counsel attempted to elicit the
> contents of an anonymous phone call.  The judge found
> that the contents of the phone call were hearsay and
> did not allow defense counsel to continue.  Instead,
> outside the presence of the jury, the judge read the
> police report describing the phone call into the
> record.  The phone call inculpated [the petitioner].
> Defense counsel continued to ask whether the witness
> was aware of anonymous phone calls relating to [the
> petitioner] but did not expressly articulate a theory
> for using the phone calls.
>
> Defense counsel raised the subject of anonymous phone
> calls with other witnesses as well.  Furthermore, in
> his summation counsel stated the following:

> I want to talk to you . . . about the Paterson
> Police Department . . . .  I think that at some
> point I started to feel like a dentist pulling
> teeth . . . to get out the fact that anonymous
> telephone calls were made to the Paterson Police
> Department . . . at a point in time to implicate
> [the petitioner].  Did you hear any of the police
> over there volunteer that information?  No.  It's
> like pulling teeth.

Counsel did not connect this evidence to any theory in
an attempt to exculpate [the petitioner.  During the
litigation before the state courts,] the State
assert[ed] that defense counsel's apparent strategy was
to demonstrate that the police

> had engaged in a slipshod investigation where it
> had acted merely after the receipt of anonymous
> telephone calls.  That is, the truth of these
> statements was irrelevant to the defense strategy;
> it merely wanted to show that the police had
> relied on two unreliable sources, and as a result,
> arrested [the petitioner] for crimes he did not
> commit.

The State's argument may generally have some merit with
respect to eliciting testimony at trial about the
anonymous calls.  That could have constituted a
legitimate, if misguided, strategy.  However, the
quoted reasoning does not adequately address counsel's
statement in summation that the anonymous calls did in
fact "implicate [the petitioner]," a statement not
supported by the record and clearly harmful.  . . .  As
[the petitioner] argues, the statement could have
conveyed to the jury that there were additional
witnesses not called at trial, who implicated defendant
in the crime.  . . .  Nevertheless, we conclude that
this error is not of such magnitude as to have led to a
different outcome of the trial.  Rather, the single
remark, though unwarranted, lacks significance in light
of the evidence produced by the State.  Given
everything the jury heard, we consider it highly
unlikely that the jurors would have been affected by
this comment.

Miller, 2007 WL 4553059, at *11-12.

In the case at bar, the respondents repeat, virtually verbatim, their position as to the defense counsel's strategy underlying the counsel's questions related to the anonymous phone calls. The state court's position appears to be that the petitioner's challenges based on his counsel's questions do not meet either prong of Strickland and -- for the reasons articulated by the state court -- this Court finds that determination not an unreasonable application of the Supreme Court precedent. Indeed, the counsel line of questioning evinces clear strategy, even though the punch-line of that strategy was left undeveloped as a result of the counsel's omission of the statements that: (a) the anonymous phone calls were indicative of someone's intent to "frame" the petitioner; and (b) the police unscrupulous willingness to act upon such questionable leads (instead of conducting a thorough investigation) might have been the reason for the petitioner's being on trial.

The Court, however, disagrees with the state court's vaguely articulated conclusion that the petitioner: (a) failed to meet the second prong of Strickland as to the petitioner's challenges based on his counsel's summation statement; but (b) might have met the first prong of Strickland as to the summation-based challenge. See Miller, 2007 WL 4553059, at *12 (stating "the [respondents'] reasoning does not adequately address counsel's statement in summation that the anonymous calls did in fact

implicate [the petitioner, because] the statement could have conveyed to the jury that there were additional witnesses not called at trial, who implicated defendant in the crime").  If the state court meant to find that the petitioner's challenges based on his counsel's summation met the first test of Strickland, this Court finds such conclusion an unreasonable application of the Strickland test.

Nothing in Strickland suggests that lack of eloquence (which, in turn, is necessarily laden with the danger of alternative readings or misunderstandings) could be equated with counsel's ineffective assistance or lack of strategy.  Here, the state court elected to put its emphasis on the fact that the anonymous phone calls implicated the petitioner (even though this fact was not disclosed to the jurors).  However, nothing in the counsel's language prevented the jurors' from putting the emphasis on the anonymity of these calls; such emphases begs for the inference that these phone calls provided the police with an unwarranted investigatory lead and detracted the police from pursuing the actual assailant.  Consequently, only in the event the state court meant to conclude that the petitioner's challenges based on the summation language met the first prong of Strickland, this Court finds such conclusion an unreasonable application of the Supreme Court precedent.  However, regardless of whether the state court intended -- or did not intend -- to

find that the petitioner met the first prong of <u>Strickland</u> as to his challenges based on his counsel's summation language, the outcome of the state court's decision was a reasonable application of <u>Strickland</u>.  Therefore, the petitioner's challenges do not warrant issuance of a writ.

### B.    CHALLENGES BASED ON EVIDENTIARY BASIS

Finally, the petitioner asserts that his conviction on felony-murder charges was unwarranted since -- in the petitioner's opinion -- the entirety of evidence introduced at his trial was wholly void of any statement suggesting that Huertas and Esquilin were robbed during -- or right prior to -- Esquilin's murder.  <u>See</u> docket entry no. 17, at 23-31 (where the petitioner is suggesting that the shooting was solely the result of the assailants' desire to punish Huertas and Esquilin for "disrespect").

The state court's decision did not explain address this challenge.  <u>See</u> <u>generally</u>, <u>Miller</u>, 2007 WL 4553059.  This is hardly surprising since this Court's detailed study of two thousand three hundred and seventy pages of the record submitted in this matter failed to locate any petitioner's application addressed to the state courts that raised this particular challenge.  Therefore, this challenge is, generally, subject to dismissal for failure to exhaust state remedies.  However, the stay analysis is facially inapplicable in this matter in light of

the final challenge failure to articulate a colorable claim.  See
Rhines v. Weber, 544 U.S. 269, 277 (2005); Lambert v. Blackwell,
134 F.3d 506, 515 (1997) (relying on Granberry v. Greer, 481 U.S.
129, 135 (1987)).   Therefore, this Court will address this
petitioner's final challenge on merits, since the habeas statute
allows the Court to address the merits of unexhausted meritless
claims.  See 28 U.S.C. § 2254(b)(2),

>   The respondents are entirely correct in their assertion that
>
> > A claim that the verdict is against the weight of the
> > evidence is essentially a matter of state law, and does
> > not raise a federal constitutional question unless the
> > record is completely devoid of evidentiary support in
> > violation of the Petitioner's due process rights.  See
> > Cunningham v. Maroney, 397 F.2d 724, 725 (3d Cir.
> > 1968), cert. denied, 393 U.S. 1045 (1969).  Only where
> > no rational trier of fact could have found proof of
> > guilt beyond a reasonable should a writ issue.  [See]
> > Jackson v. Virginia, 443 U.S. 307, 324 (1979); Singer
> > v. Court of Common Pleas, Bucks County, 879 F.2d 1203,
> > 1206 (3d Cir. 1989).  Factual issues determined by a
> > state court are presumed to be correct, and the
> > [p]etitioner bears the burden of rebutting this
> > presumption by clear and convincing evidence. [see]
> > Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000)
> > (citing U.S.C. section 2254(e)(1)).

Docket entry no. 13, at 6-7.

Here, the jurors found that a robbery took place, and the
record includes Clyburn's testimony that one of the assailants
stated, "Give it up" to Huertas and Esquilin, see docket entry
no. 15-3, at 38, the terminology suggesting an intent to rob.
Conversely, the petitioner provides the Court with no clear and
convincing evidence that no robbery was taking place during or

35

right prior to the murder of Esquilin.  In fact, for the purposes
of his challenges to his counsel's performance, the petitioner
asserts that his counsel unduly failed to introduce Vallardes'
testimony, while the state court clarified that

> Valladares stated [to the police] as follows:
>
>> . . . I saw a black guy with braids and he asked
>> the crowd out on the block if anyone had any base.
>> When he didn't get any he left and a short time
>> later he returned.  I saw him get out of the front
>> passenger side of beige Dodge Aries and he said to
>> the crowd "*Run your Shit*" *which means give me your*
>> *stuff*.

Miller, 2007 WL 4553059, at *8 (emphasis supplied).

The petitioner simply cannot have it both ways, that
is, asserting that Valladres' testimony would be truthful
for the purposes of the petitioner's challenges to his
counsel's performance, and yet simultaneously ignoring
Vallardes' statement to the police for the purposes of the
petitioner's claim that no robbery was taking place during
or right prior to Esquilin's murder.  If anything, the
petitioner's reference to Valladares' testimony provides
this Court with *additional* evidence that a robbery was
indeed taking place during/right prior to Esquilin's murder.

## III. <u>CERTIFICATE OF APPEALABILITY</u>

The Court denies a certificate of appealability because
the petitioner has not made "a substantial showing of the

36

denial of a constitutional right" under 28 U.S.C. §

2253(c)(2).  See Miller-El v. Cockrell, 537 U.S. 322 (2003).

**IV.  <u>CONCLUSION</u>**

    Based on the foregoing, the Court dismisses the

petition with prejudice and declines to issue a certificate

of appealability under 28 U.S.C. § 2253(c).  An appropriate

order accompanied this opinion.



                        <u>/s/ Katharine S. Hayden</u>
                        **Katharine S. Hayden, U.S.D.J.**

Dated: 8/2/10